**FIRST DIVISION
DOYLE, C. J.,
PHIPPS, P. J., and BOGGS, J.**

**NOTICE: Motions for reconsideration must be
*physically received* in our clerk's office within ten
days of the date of decision to be deemed timely filed.
http://www.gaappeals.us/rules**

**January 25, 2016**

# In the Court of Appeals of Georgia

A15A2398. LIDY v. THE STATE.                                    BO-091C

BOGGS, Judge.

A jury found Maurice Lidy III guilty on two counts of felony obstruction and one count each of aggravated battery and criminal trespass. On appeal, Lidy asserts that the evidence was insufficient to sustain his aggravated battery conviction, and that the trial court erred in failing to merge the two obstruction counts for sentencing. We affirm but remand this case for resentencing.

So viewed, the evidence showed that officers arrived at a storm-damaged hotel closed for business but under repair, to find Lidy and another man occupying one of the rooms where the door had been pried open. The two men were placed under arrest for criminal trespass. When a police lieutenant handcuffed Lidy behind his back, Lidy "became agitated about why he was being arrested . . . . he kept getting louder and

louder." The assistant police chief instructed the lieutenant to place Lidy in the patrol car. At this point, Lidy began screaming and displayed "nervous energy movement." The chief then joined the lieutenant to escort Lidy to the patrol car with both the chief and officer having "a hold of [Lidy]" by his elbows on each side of him. As they walked, Lidy "kept getting faster and faster . . . . He wouldn't slow down." The lieutenant and chief then put Lidy "over the handrail . . . to try to get him to slow down. Once we did that is when the scuffle started."

According to the lieutenant, Lidy "jerked back" and he lost his grip on Lidy. The three of them "wound up getting turned back around" away from the patrol car. The tussling lasted only seconds. The lieutenant testified that when he again regained his hold on Lidy, he heard the chief say "he's broke my leg." The lieutenant placed Lidy on the ground, and a third officer came to assist. Lidy then complained that the officers broke his left wrist. The third officer looked down and noticed that Lidy had "turned his wrist in the cuff," which explained why he was screaming in pain. Another officer removed Lidy's handcuffs.

The hotel manager testified that Lidy "was kind of [sic] was not listening to anything. He was just screaming and crying and was tried [sic] to pull his hand from the handcuff." He stated further that Lidy was bleeding "because he was just like

2

pulling so hard and an officer tried to explain, saying to just cool down. And just they was[sic] trying to help him to remove that, but he was just forcing even worse." The third officer, still with the other man found in the hotel room, testified that he "heard a bunch of screaming and yelling . . . . I looked down and as I did, I saw Mr. Lidy throw himself backwards against [the chief] and [the lieutenant]." He stated further that Lidy "looked like he pushed back on his feet," and that after that "[a] struggle started." As he secured the second man, this officer then turned and heard the chief yell out that Lidy broke his leg: "And I looked back and I could see [the chief] and he looked like he was in obvious pain."

The chief testified that when Lidy was placed in handcuffs and told he was under arrest for criminal trespass, "he went from nervousness to anger instantaneously." The chief used his "hinged handcuffs" to handcuff Lidy and used the "finger test" to make sure he could get his index finger in and out - an indication that the handcuffs were not on too tight. He explained that he had one hand close to Lidy's left wrist and one hand on his left elbow, and that the lieutenant was on Lidy's other side with at least one hand on him. The chief stated further that as the three of them walked toward the patrol car, Lidy would stop, look over his left shoulder at the chief and argue that he had no right to put him in jail. He explained that as Lidy was

3

"pushing backwards to keep from going towards the patrol car, I took the hand that I already had near the handcuffs and reached down, and it's been explained here in court before, the wrist lock or pain compliance technique to try to get him to move up so we can get the leverage to push him forward." When the chief applied the pressure on his wrist, Lidy "jump[ed] up and that's when the going back and forth started. That's when we turned him towards the handrail that was there." Lidy then

> kind of comes backwards. When he comes back down he starts thrashing left and right. When he goes to the right that's when we start losing our grip as we're trying to push him towards the handrail . . . . As we tried to direct him to go back over to the handrail to get him pinned against the handrail to get more control, that's when [the lieutenant] loses his grip and I lose my grip on one hand . . . . And as I'm losing my grip on the second hand, the hand towards the handcuffs, is when he's twisting because it's pulling my arm this way. So I'm losing my grip on his wrist. I tried to get an arm around him to try to get him up against the handrail . . . . Around his shoulder . . . . I'm trying to get in there . . . . to try to hold him and get him up against the rail. That didn't work . . . I tried to get him up and tried to get him around and before I could get a good grip with the other hand to kind of pin him up against the bar he started slipping back out from underneath me.

The chief stated further, "I started losing my balance and as I went to get a hand on the ground and trying to grab hold of him at the same time, that's when I saw him turn

4

his body and he went into my knee at that point as we were going down . . . . As he is falling he turns his shoulder, his right shoulder and he falls on my left leg." The chief explained that Lidy had "broken free" at the time he began falling on his leg. When asked how much time passed between the time Lidy was "jerking and jumping," and the time he ended up on his knee, the chief responded: "Within ten seconds. I mean, it was very fast, very quick." He added that the time elapsed after they lost control of Lidy was "[p]robably a second, if that, because by the time we had lost full control of him and I started to fall and Mr. Lidy was coming down on top of me, I mean, there was almost no time difference."

The chief testified that when Lidy fell on his knee, he "felt the pop in [his] knee and [he] felt the pain come up [his] leg and into [his] back," and could remember dragging himself out from underneath Lidy. The chief was taken to a hospital by ambulance where he was given medication for pain. He was diagnosed with a severe sprain and was on crutches for several weeks after which he wore a knee brace.

1. Lidy argues that the evidence was insufficient to sustain his conviction for aggravated battery because there was no evidence to permit a finding that he acted maliciously when he fell on the chief's leg. He contends that the injury to the chief's leg was an accident: "Handcuffed in the drizzling rain, thrown onto a handrail,

5

flanked by two officers (one of whom lost his footing in the gravel), Lidy did not purposefully tumble down after the [chief]."

OCGA § 16-5-24 (a) provides: "A person commits the offense of aggravated battery when he or she maliciously causes bodily harm to another by depriving him or her of a member of his or her body, by rendering a member of his or her body useless, or by seriously disfiguring his or her body or a member thereof." Here, the evidence showed that Lidy was angry, yelled at and argued with officers, jumped and thrashed about and threw himself backward against the officers, and then turned his shoulder into the chief and fell onto his leg. "Every person is presumed to intend the natural and probable consequences of his conduct, particularly if that conduct be unlawful and dangerous to the safety or lives of others." (Citations and punctuation omitted.) *Scott v. State*, 225 Ga. App. 729, 731 (2) (484 SE2d 780) (1997). While Lidy contended that he did not intentionally cause the chief harm, and the jury was instructed on misfortune or accident,[1] whether he acted with malice was for the jury

---

[1]The trial court also instructed the jury: "Malice is not ill will or hatred. For the purpose of this Code Section malice means an actual intent to cause the particular harm produced; that is, bodily harm without justification or excuse . . . Malice is also the wanton or willful doing of an act with an awareness of a plain and strong likelihood that such particular harm may result. Intention may be shown by the circumstances connected with the offense."

to determine, and it was authorized to conclude that he did so under the evidence presented. See, e.g., *Lee v. State*, 275 Ga. App. 93, 95 (619 SE2d 767) (2005) (whether defendant accidentally burned baby was for jury to determine); *Allen v. State*, 247 Ga. App. 10, 16-17 (4) (b) (543 SE2d 45) (2000).

2. Lidy contends that the trial court erred in failing to merge the two counts of felony obstruction for purposes of sentencing. We agree. The indictment charged Lidy with two counts of obstruction, one against each officer, for "knowingly and willfully resist[ing] . . . by offering violence to the person of such officer by struggling with said officer." See OCGA § 16-10-24 (b). "[A]lthough a defendant may be tried on multiple counts arising out of the same conduct, the rules of merger permit only one conviction and sentence for a single crime and all included offenses." (Citation and footnote omitted.) *Stevenson v. State*, 272 Ga. App. 335, 336 (1) (612 SE2d 521) (2005).

The State argues that because Lidy's resistance affected both officers, the obstruction counts do not merge. But Lidy's act of resistance lasted only a few seconds and affected both the lieutenant and the chief simultaneously. The identical facts and identical allegations are relied on to establish the commission of the crime against each officer. Compare *Jackson v. State*, 295 Ga. App. 427, 433 (5) (671 SE2d

7

902) (2009) ("each charge of obstruction 'was separate and distinct with independently supporting facts'"). There is no clear distinction here between the way Lidy struggled with the lieutenant and the way he struggled with the chief, although the struggle resulted in an injury to the chief only.

The cases cited by the State holding that the merger doctrine does not apply if each of the charged crimes was committed against a different victim, are inapplicable here. The crime of obstruction involves resisting a law enforcement officer in the lawful discharge of his or her duties. Oftentimes, those duties are identical and officers carry out those duties as a group simultaneously and are therefore obstructed or met with resistance simultaneously. For example, when a suspect flees from the joint hold of more than one officer. Unless the evidence shows that each officer was obstructed in a different way or at a different point in time, multiple obstruction charges against multiple officers should merge for purposes of sentencing.

Because the same conduct established the commission of the multiple crimes here, those offenses must merge for purposes of sentencing. Compare *Jackson*, supra (no merger where defendant obstructed each of the five officers in separate and *distinct* ways); *Ojemuyiwa v. State*, 285 Ga. App. 617, 621-622 (4) (647 SE2d 598) (2007) (misdemeanor and felony obstruction counts do not merge when defendant

8

kicked one officer and later failed to obey commands of another). The trial court erred in failing to merge these counts. We therefore vacate Lidy's sentence and remand this case for resentencing.

*Judgment affirmed, sentence vacated, and case remanded for resentencing. Doyle, C. J. and Phipps, P. J., concur.*